**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **CONTINENTAL INSURANCE COMPANY, GIBSON GUITAR CORP., HARRIS CORPORATION, OSG SHIP MANAGEMENT, INC., CARTERS, INC., L-3 COMMUNICATIONS HOLDINGS INC., QINETIQ NORTH AMERICA OPERATIONS LLC, ABC BUS COMPANIES INC. , INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, TOKIO MARINE & NICHIDO FIRE INSURANCE CO. LTD. (U.S. BRANCH), NISSAN NORTH AMERICA, METAL ONE HOLDINGS AMERICA, INC., and FIREMAN'S FUND INSURANCE COMPANY,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| **Plaintiffs,** | **Case No. 3:12-cv-0433** ) ) |
| **v.** | **Chief Judge Todd Campbell** ) ) |
| **UNITED STATES OF AMERICA,** | ) ) ) |
| **Defendant.** | ) ) ) ) ) ) ) ) |

**AMENDED COMPLAINT**

Plaintiffs, for their complaint against the Defendant, respectfully state as follows:

**NATURE OF THE CASE**

1.      Plaintiffs bring this action seeking just compensation from the United States of America for injuries, losses and damages to Plaintiffs' properties and businesses suffered as a result of the negligence and gross negligence of the United States government and its agencies prior to and during the May 2010 storm event in the Cumberland River Basin. Tragically, there were twenty-six fatalities and an estimate of over $2 billion in property damages in the Nashville and surrounding areas related to the May 2010 storm event.

1

2.     But for Defendant's negligence and gross negligence in the operations of its dams prior to the flooding that occurred beginning on May 2, 2010, the May 2010 storm event would have been an endurable, natural event within the 100-year flood plain along the Nashville Reach of the Cumberland River. Defendant's negligence and gross negligence created a man-made disaster, causing the Cumberland River to rise well above the 100-year flood plain and devastating much of Plaintiffs' property and businesses located along the Nashville Reach of the Cumberland River. Plaintiffs seek just compensation for their losses.

3.     Defendant operates federal dam projects located on the Cumberland River upstream from Nashville. The Old Hickory Dam and Reservoir is a hydroelectric power and navigation project, not a flood-control project. Defendant negligently operated Old Hickory Dam prior to and during the May 2010 storm event, failed to create storage capacity in the Old Hickory Reservoir in advance of predicted rainfall and negligently allowed too much headwater to build up behind the dam on Saturday, May 1 before the storm event had caused any flooding along the Cumberland River. As a result of that negligence, Defendant released on May 2 through May 5 massive amounts of water into the Nashville Reach, causing the Cumberland River to surge and causing waters that otherwise would have been contained within the 100-year flood plain and flood way to rise and create a man-made flood above the 100-year flood plain. Defendant then negligently failed to warn of the danger created.

4.     The negligent and wrongful acts and omissions of Defendant involve, but are not limited to, the implementation, execution, operation, management, maintenance, procedures, supervision, control, scientific and engineering assessments and related activities of Defendant, and breaches of the various duties of care owed with respect to the Defendant's mismanagement

of water through the Nashville Reach of the Cumberland River that extends from Old Hickory Dam to Cheatham Dam.

5.      The negligent and wrongful acts and omissions of Defendant further involve, but are not limited to, the implementation, execution, operation, management, procedures, reporting, supervision, control, scientific and engineering assessments and exchange of scientific data, and related activities and breaches of the various duties of care owed by Defendant with respect to Defendant's preparation and dissemination of information to the Plaintiffs.

6.      The negligence and gross negligence of Defendant directly and proximately caused catastrophic destruction, damages, losses and other substantial harm to the real and personal property and business operations of Plaintiffs, which Plaintiffs would not otherwise have suffered as a result of the May 2010 storm event.

## THE PARTIES

7.      Plaintiff CONTINENTAL INSURANCE COMPANY is a corporation duly organized under the laws of the State of Pennsylvania, with its principal place of business at 333 South Wabash Avenue, Chicago, Illinois 60604.    At all times relevant, CONTINENTAL INSURANCE COMPANY was and is engaged in the business of insuring property within the various states of the United States.

8.      Plaintiff GIBSON GUITAR CORP. is a subrogor of Plaintiff CONTINENTAL INSURANCE COMPANY, as more fully set forth in Schedule A attached hereto, and incorporated herein.

9.      Plaintiff, HARRIS CORPORATION is a subrogor of Plaintiff INDEMNITY INSURANCE COMPANY OF AMERICA as more fully set forth in Schedule A attached hereto, and incorporated herein.

10.     Plaintiff, OSG SHIP MANAGEMENT, INC. is a subrogor of Plaintiff INDEMNITY INSURANCE COMPANY OF AMERICA as more fully set forth in Schedule A attached hereto, and incorporated herein.

11.     Plaintiff INDEMNITY INSURANCE COMPANY OF AMERICA is a corporation duly organized under the laws of the State of Pennsylvania, with its principal place of business located at 436 Walnut Street, Philadelphia, Pennsylvania 19106.   At all times relevant, INDEMNITY INSURANCE COMPANY OF AMERICA was and is engaged in the business of insuring property within the various states of the United States.

12.     Plaintiff, CARTERS INC. is a subrogor of Plaintiff INDEMNITY INSURANCE COMPANY OF AMERICA as more fully set forth in Schedule A attached hereto and incorporated herein.

13.     Plaintiff L-3 COMMUNICATIONS HOLDINGS INC. is a subrogor of Plaintiff INDEMNITY INSURANCE COMPANY OF AMERICA as more fully set forth in Schedule A attached hereto and incorporated herein.

14.     Plaintiff QINETIQ NORTH AMERICA OPERATIONS, LLC, is a subrogor of Plaintiff INDEMNITY INSURANCE COMPANY OF AMERICA as more fully set forth in Schedule A attached hereto and incorporated herein.

15.     Plaintiff ABC BUS COMPANIES INC., is a subrogor of Plaintiff INDEMNITY INSURANCE COMPANY OF AMERICA as more fully set forth in Schedule A attached hereto and incorporated herein.

16.     Plaintiff TOKIO MARINE & NICHIDO FIRE INSURANCE CO. LTD. (U.S. BRANCH) is a foreign corporation with its principal place of business at 230 Park Ave., New York, NY 10169.   At all times relevant, TOKIO MARINE & NICHIDO FIRE INSURANCE CO. LTD. (U.S. BRANCH) was and is engaged in the business of insuring property within the various states of the United States.

17.     Plaintiff NISSAN NORTH AMERICA is a subrogor of TOKIO MARINE & NICHIDO FIRE INSURANCE CO. LTD. (U.S. BRANCH) Plaintiff as more fully set forth in Schedule A attached hereto and incorporated herein.

18.     Plaintiff METAL ONE HOLDINGS AMERICA, INC. is a subrogor of Plaintiff TOKIO MARINE & NICHIDO FIRE INSURANCE CO. LTD. (U.S. BRANCH) as more fully set forth in Schedule A attached hereto and incorporated herein.

19.     Plaintiff FIREMAN'S FUND INSURANCE COMPANY is a corporation duly organized under the laws of the State of California, with its principal place of business at 777 San Marin Drive Novato, California 94998.   At all times relevant, FIREMAN'S FUND INSURANCE COMPANY was and is engaged in the business of insuring property within the various states of the United States.  FIREMAN'S FUND INSURANCE COMPANY is a subrogee of Verizon Communications, Inc., as more fully set forth in Schedule A attached hereto and incorporated herein.

21.     Defendant United States of America is a sovereign government subject to suit for civil liability in accordance with the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*, and/or admiralty and maritime laws, and/or the Constitution and Laws of the United States as alleged herein. Defendant is a proper defendant in this lawsuit for damages arising from the alleged negligent or wrongful actions or omissions of the United States Government and its agencies, the United States Corps of Engineers ("USACE") and the National Weather Service ("NWS").

22.     The USACE is a division of the United States Government under the direct jurisdiction of the United States Department of the Army.

23.     The NWS is a federal agency that is part of the National Oceanic and Atmospheric Administration, which is part of the United States Department of Commerce.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1346(b), as a lawsuit brought against the United States government under the FTCA based on the wrongful actions and omissions of employees the United States of America and its agencies, including the USACE and the NWS, while those employees were acting within the scope of their office or employment.

25.     Plaintiffs previously presented the USACE and the NWS with written administrative claims as required by the FTCA, 28 U.S.C. § 2671, *et seq.*

26.     Plaintiffs have not yet received a determination of their Claims filed with the USACE and the NWS under the FTCA.

6

27.     Plaintiffs have complied with the provisions of the FTCA and bring this action within the applicable time period, six months having elapsed since the filing of each Plaintiff's administrative claims.

28.     Alternatively, in an abundance of caution, Plaintiffs assert admiralty and maritime jurisdiction and causes of action under the Admiralty Extension Act, 46 U.S.C. § 30101, *et seq.,* the Suits in Admiralty Act, 46 U.S.C. § 30901, *et seq.*, the Public Vessels Acts, 46 U.S.C. §§ 31101-13, and the general maritime laws of the United States.

29.     Plaintiffs previously presented the USACE and the NWS with separate written administrative claims as required by 46 U.S.C. § 30101.

30.     Plaintiffs have not yet received a determination of their Claims filed with the USACE and the NWS under the various admiralty and maritime laws.

31.     Plaintiffs have complied with the provisions of the admiralty acts and maritime laws and bring this action within the applicable time period, six months having elapsed since the filing of Plaintiffs' administrative claims and within two years of the date on which Plaintiffs' damages were suffered.

32.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1402(b) because Defendant is the United States government, Defendant's negligent and wrongful actions or omissions occurred in whole or in part in the Middle District of Tennessee, and the damages suffered by Plaintiffs occurred within the Middle District of Tennessee.

## WAIVER OF SOVEREIGN IMMUNITY

33.     The sovereign immunity of Defendant is waived in connection with claims asserted against them in this suit by the enactment of the FTCA and/or under the admiralty acts and maritime laws.

## FACTUAL BACKGROUND

The Cumberland River Basin

34.     The Cumberland River is a crescent-shaped navigable waterway and tributary of the Ohio River that lies within the states of Kentucky and Tennessee. The Cumberland River generally flows east to west. The Cumberland River flows through the city of Nashville, Tennessee, among other communities, and the portion that flows through Nashville is referred to herein as the "Nashville Reach."

35.     Geographically, the city of Nashville sits within the Central Basin and is encircled by a geological formation called the Highland Rim, which rises east of Old Hickory Dam and west of Cheatham Dam. Topographically, the Central Basin is a depression or bowl carved out of Middle Tennessee, which forms a watershed, or drainage area, that directs runoff into center of the Central Basin and into the Nashville Reach of the Cumberland River.

36.     Over one-half of the population of the Central Basin of the Cumberland River lives within the Nashville Metropolitan Statistical Area, which is principally located within Davidson County, Tennessee.

37. Congress authorized the construction of ten federal dam projects on the Cumberland River. Five of the projects are located on the main stem of the Cumberland River and five are located on its tributaries.

38. The USACE implemented these congressional directives and designed, constructed, and operates the authorized dam projects. The main stem projects impound and otherwise manipulate the natural flow of the Cumberland River for certain dam-specific purposes set forth in the authorizing legislation and incorporated plans.

39. The Old Hickory Lock and Dam is a mainstem dam authorized by Congress in the River and Harbor Act of 1946, Pub. L. No. 79-525. Completed by the USACE in 1957, Old Hickory sits at the eastern end of the Nashville Reach, approximately 24 miles upstream from Nashville.

40. Old Hickory was congressionally authorized exclusively for purposes of navigation and hydropower. It was not authorized by Congress as a flood-control project and serves no congressionally authorized flood-control purpose.

41. The USACE controls the flow of water out of Old Hickory and into the Nashville Reach. USACE manipulates the water level and rate of flow (as measured by cubic feet per second or "cfs") at and through the navigation projects of the Cumberland River generally on an hour-by-hour basis.

42. The Old Hickory Dam project manipulates and alters what otherwise would have been the natural flow of the Cumberland River through Nashville.

43.     Cheatham Dam, another congressionally authorized dam on the Cumberland River, sits on the western end of the Nashville Reach. The Nashville Reach is, in effect, a man-made lake between Old Hickory Dam and Cheatham Dam.

44.     In designing, constructing, and operating the Cumberland River Basin projects, including Old Hickory Dam, the Corps developed and used basic flood estimates, one of which is called the "standard project flood."

45.     The "standard project flood" is based on the "standard project storm." The "standard project flood" can be defined as a hydrograph representing run-off from the standard project storm.

46.     The "standard project storm" is defined as the "estimate for a particular drainage area and season of the year in which snow-melt is not a major consideration and should represent the most severe flood-producing rainfall depth–area–duration relationship and isohyetal pattern of any storm that is considered reasonably characteristic of the region in which the drainage basin is located." The term "storm" is used in a broad sense to mean any period or sequence of rainfall events that may contribute to critical flood events in the particular drainage basin.

Dam Management and Operations

47.     The USACE water control plans and dam manuals govern the USACE's operation and management of federal dam projects, including Old Hickory.

48.     In particular, the USACE's water control plans and dam manuals for the Cumberland River Basin include instructions on how to utilize the storage capacity at the project reservoirs.

49.     At Old Hickory Dam, the USACE defines three horizontal zones or pools in the lake reservoir created behind the dam. From the bottom of the lake to the top, the zones are (1) the inactive pool, (2) the power pool, and (3) the surcharge pool.

50.     The inactive pool, or bottom storage zone, offsets lake sedimentation and provides head for hydropower. It also can provide depth for slack water navigation, recreation, habitat for fish and wildlife, and insurance for drought periods.

51.     The power pool, or middle storage zone, is the storage capacity of the reservoir used for daily hydropower generation at the project and the level of the reservoir during periods of "Normal Regulation," as provided in the USACE's Water Control Manual and its Instructions for Reservoir Regulation.

52.     The surcharge pool, or uppermost zone, is the storage capacity of the reservoir that is used to mitigate the effects of the reservoir on downstream river crests. It is intended to store the quantity of water that under natural conditions would have been stored in the former river valley, but which natural storage was lost due to the impoundment from the project. The surcharge pool is used during periods of "Flood Regulation," pursuant to the USACE's Water Control Manual and Instructions for Reservoir Regulation.

Old Hickory Dam

53.     The power pool at Old Hickory Reservoir extends from the elevation of 442 to 445 feet. When operated to enhance recreation, the power pool is maintained in the upper one foot of the power pool, or between elevations of 444 and 445 feet.

54.     The surcharge pool at Old Hickory Reservoir extends from the elevation of 445 to 450 feet.

Case 3:12-cv-00433   Document 21   Filed 05/23/12   Page 11 of 44 PageID #: 97

55.     The USACE's "Old Hickory Dam Instructions for Reservoir Regulation" define three types of regulation of the reservoir: Normal Regulation, Flood Regulation, and Drought Regulation.

56.     During periods of "Normal Regulation" at Old Hickory, the water level elevation of the reservoir is maintained within the power pool, or between 442 and 445 feet. The power pool is used to generate hydropower and to facilitate recreation.

57.     The "Flood Regulation" instructions for Old Hickory Reservoir further provide that surcharge storage is "best used just prior to the peak of the flood to maximize reduction of the peak outflow from the project. . . . If the flood surcharge storage is used too soon, there could be no storage space remaining when the peak arrives." "Thus, the surcharge storage and any additional storage that can be gained by pre-flood drawdown should be preserved until it is clearly evident that the storm has passed."

58.     During periods of "Flood Regulation" at Old Hickory, pre-flood drawdown to elevation 442 (the power pool level) is permitted upon direction from the USACE's Water Management. All other operating objectives of the Cumberland River projects, including hydropower, become secondary considerations during periods of "Flood Regulation."

59.     Accordingly, to utilize the additional storage capacity of Old Hickory Reservoir within the power pool, it is necessary for the USACE to make releases of water into the Nashville Reach in advance of predicted heavy rainfall.

60.     USACE engineering regulations require the creation of an Emergency Action Plan ("EAP") for every USACE operated dam.

61.     As described in the engineering regulation, an EAP "is a formal document that identifies potential emergency conditions (either dam failure or large spillway releases) at a dam and specifies preplanned actions to be followed in order to minimize property damage and loss of life."

62.     On information and belief, Old Hickory has an EAP.

Responsibilities of the National Weather Service

63.     The National Weather Service ("NWS") develops and publishes weather forecasts and warnings and hydrologic forecasts and warnings, including river flows, river stage predictions, and river stages.

64.     River stage forecasts are generated by computer programs that calculate how a volume of rainwater will fill the topography of the Cumberland Basin.

65.     The "stage" level of the Cumberland River in Nashville rises as more water is discharged through Old Hickory Dam. "Minor flood stage" for the Nashville Reach is established at 40 feet (below the 100-year flood plain), which corresponds to a discharge flow rate through Old Hickory Dam of approximately 110,000 cubic feet per second ("cfs"). "Major flood stage" for the Nashville Reach is established at 45 feet.

Interagency Relationship of the USACE and National Weather Service

66.     The respective duties of the USACE and the NWS are interrelated and complementary, requiring the collection, coordination and exchange of hydrological and meteorological information and data.

67.     In recognition of the interrelatedness of the missions and duties of the USACE and the NWS and the need to coordinate with each other in the collection and analyses of

13

meteorological and hydrological data and information, the USACE and the NWS entered into a Memorandum of Agreement in 1991. The 1991 Agreement requires USACE and NWS to exchange meteorological and hydrological data.

68.     The USACE produces daily reports detailing the latest observed and 5-day forecasted releases from each dam project it operates on the Cumberland River. The USACE transmits that information and data for these forecasted releases to the NWS via daily electronic mail.

69.     In May 2010, the USACE's projected releases from each dam project were based on observed, or actual, rainfall that occurred during the past 24-hour period, or "rain on the ground," as of 6:00 a.m. each day. The USACE's daily report of projected releases did not account for forecasted precipitation for that same day.

70.     The NWS uses the daily reports received from the USACE to forecast stream flow and river stages for the Cumberland River, including the Nashville Reach.

71.     At the time of the May 2010 storm event, NWS did not know that the USACE's daily report was limited to observed or actual rainfall that has occurred during the past 24-hour period, or "rain on the ground," and did not include or account for the expected run-off of rain waters from the forecasted precipitation during the next 24-hour period.

72.     During major storm events, an intensive interagency effort between the NWS, USACE and USGS is necessary to forecast flooding and respond to catastrophic conditions and impacts.

73.     During periods of flooding on the Cumberland River system, the USACE's Nashville District Water Management is required to "maintain close contact" with the USACE's

Ohio River Division Water Management, the NWS Ohio River Forecast Center, and the NWS Service Hydrologists to "keep all informed as to flood control strategy."

## The May 2010 Storm Event

74.    On April 24, 2010, a weather system of showers and thunderstorms moved through the Cumberland River Basin and brought widespread rainfall in amounts of 1 to 3 inches.

75.    As a result of the discharge of water from the April 24 rains through Old Hickory Dam, the tail waters (water level immediately downstream) of Old Hickory Dam rose in a matter of 24 hours by more than 6 feet. The river stage level at the downtown Nashville gage of the Cumberland River rose 1.7 feet.

76.    The April 24, 2010 storms saturated the ground in the Central Basin of the Cumberland River, increasing soil moisture and stream flows and thereby increasing the likelihood that a subsequent rainfall in the same area would result in significant run-off of rain waters into the main stem of the Cumberland River.

April 27-30, 2010 – The Developing Storm System

77.    On Tuesday, April 27, 2010, the USACE and the NWS noted that there was a significant rainfall event predicted to begin in the Cumberland River Basin on Friday, April 30.

78.    On Wednesday, April 28, 2010, the USACE noted the magnitude of the storm system that was headed toward the Cumberland River Basin and began monitoring the storm. The NWS issued a 5-day quantitative precipitation forecast showing a storm system with rainfall of up to 6.2 inches.

15

79.     By Thursday, April 29, 2010, the NWS was forecasting "two-to-three distinct rounds of showers and thunderstorms" over the weekend for the Cumberland River Basin, with rainfall of up to 6.6 inches.

80.     Rains of more than 6 inches in a 24- or 48-hour period are, according to Defendant's precipitation frequency estimates for Nashville, as rare as a once every 50-year storm event.

81.     Also on April 29, 2010, the USACE Ohio River Division issued a "Flood Potential Update," via electronic mail, that a significant weather event was forecasted. However, the electronic mail message transmitting this Flood Potential Update was not read by other USACE personnel and there was no mechanism at the USACE's Ohio River Division staff level to activate the staff into emergency mode.

82.     Despite the anticipated and successive rounds of heavy rainfall predicted for May 1 and 2, the USACE continued to implement "Normal Regulation" Instructions for Old Hickory Dam and Reservoir and continued to generate hydropower.

83.     The USACE only lowered the surcharge pool elevation of Old Hickory Reservoir by a mere six inches and the Nashville Reach of the Cumberland River by only one foot by April 30, 2012.

84.     By Friday, April 30, 2010, the USACE and the NWS knew of a relatively rare convergence of conditions favorable for prolonged intense rainfall in the Cumberland River Basin. USACE and NWS knew that: (i) there was an unseasonably strong late-spring storm system that had been tracking across the United States from west to east as it headed toward Middle Tennessee, (ii) there was a stationary upper air pattern that would concentrate the storm

16

in a relatively defined geographic area, (iii) there was a persistent tropical moisture feed drawing water northward into the storm system from the Gulf of Mexico, and (iv) there were impulses moving through the jet stream consistent with a strong storm system.

85.    The four factors described above, all of which were known to the USACE and NWS prior to April 30, 2010, combined to generate an intense and prolonged rainfall event in the Cumberland River Basin, with the most intense storm activity occurring on May 1 and May 2, 2010.

86.    Beginning with the NWS forecast on the morning of April 30, 2010, Defendant knew or should have known that its management of Old Hickory Reservoir in advance of a massive storm event could either minimize the impact of the incoming rainfall or exacerbate the impact and cause excessive flooding.

87.    On Friday, April 30, 2010, the NWS issued a quantitative precipitation forecast showing increased rainfall totals of up to 7 inches with a high amount of 7.8 inches in central Tennessee.

88.    Rains of more than 7 inches in a 24- or 48-hour period are, according to Defendant's precipitation frequency estimates, as rare as once every 100-year storm event.

89.    By April 30, 2010, the USACE and NWS knew that successive rounds of heavy rains falling on the basin would result in heavy storm runoff into the main stem of the Cumberland River.

90.    Despite its knowledge of the forecasted rainfall, the USACE did not implement "Flood Regulation" Instructions or release water through the spillway gates of Old Hickory Dam to preserve and create the necessary storage volume prior to the storm. Instead, the

USACE maintained power generation and navigation operations as usual under "Normal Regulation" instructions for Old Hickory Reservoir, and kept the pool in the upper ranges of the power pool, which are deemed optimal for recreational use.

91.     The USACE did not begin releasing water through the spillway gates of Old Hickory Dam until after noon on Saturday, May 1.

Saturday, May 1, 2010 – Day One of the Storm Event

92.     By the morning of May 1, there was a stalled upper air pattern and frontal boundary of thunderstorm activity, which concentrated the storm system over the Cumberland River Valley.

93.     The NWS Hydrometeorological Prediction Center issued a forecast for a record-breaking two-day rainfall event for Middle Tennessee.

94.     As of Saturday morning, the NWS had again revised its quantitative precipitation forecast upward with rainfall totals of up to 8 inches, with a high amount of 8.6 inches in Middle Tennessee.  The rainfall forecasted for this single storm was already almost twice the average monthly rainfall amount for the entire month of April.

95.     The first round of intense thunderstorms produced five to eight inches of rain across central and eastern Tennessee, including the Central Basin of the Cumberland River.

96.     Even as the rains fell, exceeding the forecasted rainfall amounts, Defendant continued to operate Old Hickory under Normal Regulation, continued to generate hydropower, and maintained the power pool in the upper one foot area of the power pool, which is the level used to enhance recreation.

97.     The USACE did not send any daily reports to the NWS on either Saturday or Sunday, May 1-2, the two most critical days of the storm event.

98.     Notwithstanding the fact that the USACE did not send and the NWS did not receive daily reports from the USACE regarding actual and projected dam releases on Saturday, May 1, the NWS issued official river stage forecasts for the Cumberland River, including Nashville, based on the data received the prior day.

99.     The NWS ran its river stage forecast models, but used day-old information and data provided by the USACE, that the NWS knew was not current, as the main input for the NWS forecast models. Moreover, the data provided by the USACE the previous day, on which the NWS relied, failed to include expected run-off of rain waters from the precipitation occurring for the remainder of the day on Saturday or the expected rainfall on Sunday, May 2.

100.    As a result, the NWS river stage forecasts for the Cumberland River predicted only minimal rises in the Cumberland River stage levels during the rest of the weekend. The NWS forecasted river stages ended up being substantially below the actual or observed rises in the Cumberland River.

101.    On Saturday morning, the NWS Ohio River Forecast Center initiated 24-hour staffing based on the magnitude of the storm event. USACE did not initiate similar 24-hour staffing and did not increase its weekend day and evening staffing.

102.    In fact, the USACE Nashville District office was minimally staffed on May 1 and 2 because those days fell over a weekend instead of a regular work week, notwithstanding the forecast of a major storm event.

103.   On Saturday morning, the NWS Ohio River Forecast Center issued its river stage forecast and sent the results of its Meteorological Model-Based Ensemble Forecast System (MMEFS) via electronic mail message to the NWS Nashville Weather Forecast Office and the USACE Nashville District office, stating:

> *Please take the attached (MMEFS) results seriously. The model trends have been consistent. We are looking at significant potential for Major Flooding. The [NWS Ohio River Forecast Center] will be staffed 24-hrs from now through Monday morning, with increased weekend day and evening staffing as well.*

104.   Notwithstanding the data and forecasted information received by the USACE and danger to people and property downstream of Old Hickory Dam, the USACE took no action to lower the level of and create additional storage capacity in Old Hickory Reservoir until Saturday afternoon.

105.   By mid-day on Saturday, May 1, the NWS issued an "Excessive Rainfall Potential Outlook" and expressed concern about much greater totals for the area noting as follows:

> WIDESPREAD STORM TOTAL AMTS IN EXCESS OF 8.0 INCHES ARE LIKELY . . . SOME VERY LOCALIZED AREAS HAVE ALREADY EXCEEDED THAT AND WOULD NOT BE SURPRISED TO SEE STORM TOTAL AMTS APCH AND/OR EXCEEDING 12 – 15 INCHES OVER SOME SPOTS.

106.   On Saturday, May 1, beginning around noon, the USACE finally began increasing discharges from Old Hickory Dam in response to the heavy rains and run-off into the Cumberland River and rising reservoir level behind the dam. The total releases at Old Hickory Dam (consisting of turbine discharges plus spillway gate releases) increased from 24,300 cfs at noon to 74,500 cfs by midnight on Saturday, May 1, but still were less than the stormwater flows entering the Old Hickory Reservoir. As a result, the Old Hickory Reservoir lost storage capacity

even while the defendant was predicting a second round of massive storms with a significant potential for major flooding.

107.     The USACE did not notify the NWS of these increases in water discharges from Old Hickory Dam.

108.     At 1:00 p.m. on Saturday, May 1, the USACE's Nashville District Commander declared a flood emergency. Despite this declaration, the USACE continued "Normal Regulation" of Old Hickory Dam rather than operating in "Flood Regulation" mode.

109.     At 1:40 pm on Saturday, May 1, the USACE'S Water Manager was on duty at the Nashville District, but left the office forty minutes after the flood emergency was declared and in the midst of the storm.

110.     USACE staff came on duty at the Nashville District at 7:00 p.m. and left at 11:00 p.m.  Between the time the Water Manager had left the Nashville District at 1:40 p.m. and water management staff returned at 7:00 p.m., the Old Hickory Reservoir rose by more than one foot. By 11:00 p.m., the Cumberland River at Nashville rose about 12 feet.

111.     Although it stopped raining for a period of time on Saturday afternoon, runoff from Saturday's rains predictably continued to flow into the Old Hickory Reservoir. The volume of inflows into the reservoir continued to exceed the outflow released through Old Hickory Dam, with the result that the reservoir elevation continued to rise throughout the day on Saturday.

112.     When the USACE finally began increasing the discharges at Old Hickory Dam as the reservoir level rose around noon on May 1, it had to increase the discharges rapidly because of its delay. The rapid increase caused the observed rises in the level of the Cumberland River at

Nashville to "far outpace" the NWS river stage forecasts throughout the afternoon and night on Saturday, May 1.

113.     From Saturday night until Sunday morning, the NWS Ohio River Forecast Center attempted to contact the USACE'S Nashville District office several times to obtain updated discharge information and data on the Cumberland River projects. The NWS' calls went unanswered because the USACE'S Nashville district office failed and neglected to have personnel on-site throughout Saturday night.

114.     As a result of the USACE's negligent failure to react to the forecasted rain event , and to implement Flood Regulation and to effectively preserve and use the storage capacity of Old Hickory Reservoir at the start of the May 2010 storm event as required by the Instructions for Reservoir Regulation, the USACE did not have sufficient storage capacity to accommodate the inflows into the Old Hickory Reservoir on Sunday, May 2, as the runoff from Saturday's and second round of forecasted rainfall flowed into the Cumberland River.

Sunday, May 2, 2010 – Day Two of the Storm Event

115.     As a direct and proximate result of Defendant's negligent acts and omissions, the Reservoir rose to the top of the lock walls and Old Hickory was in danger of being overtopped by noon on Sunday, May 2. At that point, the USACE dumped massive, historically record-setting amounts of water into the Nashville Reach of the Cumberland River. The USACE's uncontrolled discharges from Old Hickory Dam caused the Nashville Reach to rapidly rise above the 100-year flood plain.

116.     During the day on Sunday, May 2, 2010, a second round of intense thunderstorms occurred across the same area that produced additional rainfall of up to 8 inches.

117.    By 6:00 a.m. on Sunday, May 2 and with no overnight water management staff on duty, the USACE allowed the Old Hickory Reservoir to rise to 447.75 feet, using almost three feet of the surcharge pool before the second round of heavy rainfall had arrived and well before the peak of the flood that would result from rainfall runoff draining into the Central Basin of the Cumberland River.

118.    At 7:15 a.m. on Sunday, May 2, while the second, forecasted rainfall began to pound on Nashville, the NWS Ohio River Forecast Center contacted the USACE's Ohio River Division to ask for updated projected release data and projections for future releases at the Cumberland River projects. NWS was told by the USACE's Ohio River Division that the Nashville District staff would be in around 7:30 a.m.

119.    At around 8:30 a.m. on Sunday, May 2, after the USACE's staff arrived at the Nashville District office, the USACE's Ohio River Division facilitated a telephone call between the NWS Ohio River Forecast Center and the USACE's Nashville District office.

120.    During that conference call, the NWS and the USACE discussed the forecasted rainfall amounts, the USACE's current and projected water releases from the Cumberland River projects, and the divergence between two different NWS river stage projections for the Cumberland River.

121.    One of the NWS river stage model simulations, which relied on NWS computer-generated projections of releases from the Old Hickory Dam rather than USACE report of projected releases from the Old Hickory Dam, projected a river stage of approximately 54 feet for the Cumberland River at Nashville. A river crest stage of 54 feet (about 422 feet above sea

level) for the Cumberland River at Nashville equates to a risk of extreme flooding (e.g., the 500-year stage level is about 421 feet above sea level).

122.    A second NWS forecast model simulation, which utilized USACE projected releases from the Old Hickory Dam, projected a river stage of approximately 41.9 feet (about 410 feet above sea level).

123.    The NWS and the USACE discussed these crucial discrepancies during the conference call, but those differences were left unresolved.

124.    Notwithstanding its knowledge that one of its computer forecast models had projected a river crest of 54 feet for the Cumberland River at Nashville, the NWS issued an updated official river stage forecast that was released to the public at 9:39 a.m. on Sunday, May 2 with a projected river crest of 41.9 feet at 7:00 p.m. for Nashville.

125.    The Defendant knew that a river crest of 54 feet for the Cumberland River would create a threat of loss of life and inordinate property damage.

126.    At the time the NWS issued its forecasted river crest of 41.9 feet for Nashville, the second round of heavy rains had begun falling on Sunday morning and the Cumberland River at Nashville was already at 40 feet. Additional heavy rains were predicted for Sunday.

127.    At 9:50 a.m. on Sunday, May 2, the NWS upgraded its "Flood Advisory" to a "Flood Warning."

128.    At 10:00 a.m. on Sunday, USACE stated that it could maintain discharges from Old Hickory at 100,000 cfs, which would have avoided the waters in the Nashville Reach rising above the 100-year flood plain. The Defendant was wrong. A mere 21 minutes after the

NWS released its official forecast of a river crest of 41.9 feet, the USACE again dramatically began increasing the discharges at Old Hickory Dam because of the rapidly rising reservoir level from the heavy Sunday morning rains. The USACE increased the volume of water released at Old Hickory Dam from 80,300 cfs at 10:00 a.m. to 123,600 cfs by 1:00 p.m.

129.    Releasing such massive amounts of water in the Cumberland River through the Old Hickory Dam between 10:00 a.m. and 1:00 p.m., created a surge of water that caused the Cumberland River to rise quickly and far outpace the NWS forecast. In fact, the NWS' forecasted crest of 41.9 feet to occur at 7:00 p.m. on Sunday was already exceeded by 11:30 a.m., less than two hours after the official forecast had been issued.

130.    At 11:18 a.m. on Sunday, May 2, the NWS issued a revised forecasted river crest at Nashville of 45.0 feet, or major flood level, to occur at 7:00 p.m. that evening.

131.    In breach of the USACE's duty to preserve the surcharge pool for the peak of the flood, the USACE negligently allowed the surcharge pool to become full by noon on Sunday, May 2, even as the second round of heavy rains continued to fall and the run-off from those rains flowed into the Central Basin of the Cumberland River.

132.    During an extended and critical period of time on Sunday, May 2, 2010, from 9:50 a.m. to 8:05 p.m., the USACE's Nashville District office lost its network communications due to a break in its internet cable. The USACE failed to have adequate emergency, redundant or back-up communications equipment, systems or plans in place. As a result, the USACE lost the ability to communicate crucial data and information timely and effectively with the NWS, the USACE Ohio River Division personnel, and others regarding rapidly increasing discharges (outflows) from Old Hickory Dam.

133.    At 1:30 p.m. on Sunday, May 2, the USACE's Ohio River Division again facilitated a telephone conference call between NWS Ohio River Forecast Center and the Nashville District office. The USACE's Nashville District office advised the NWS that the discharges at Old Hickory would be increased to 130,000 cfs and possibly up to 140,000 cfs by 2:00 p.m.  Inexplicably, the NWS and USACE made no plans to increase the frequency of their communications despite the USACE's network outage and the escalating flood emergency.

134.    Shortly after the 1:30 p.m. conference call, the USACE began even more aggressive increases in the volume of water discharged from Old Hickory Dam, as often as every 15 minutes. Once again, the USACE failed to notify the NWS about these significant increases.

135.    By noon on Sunday, May 2, the USACE had allowed Old Hickory Reservoir to rise to the top of the surcharge pool, robbing the reservoir of any remaining storage capacity well before the peak of the flood and necessitating larger releases than otherwise would have been necessary, as well as larger than what the USACE had just told the NWS.

136.    Having failed on Saturday, May 1 to create the storage capacity required as a result of Saturday morning's forecast of more than 8 inches of rain, the USACE had no remaining storage capacity at Old Hickory Reservoir and no choice other than to rapidly increase the discharges on Sunday, May 2 from 130,300 cfs at 2:00 p.m. to 212,260 cfs by 6:00 p.m. Despite the USACE's conclusion four hours earlier that discharges at Old Hickory Dam would not exceed 100,000 cfs, the USACE released these larger volumes, that damaged the Plaintiffs.

137.    Notwithstanding the USACE's second dramatic and unprecedented increase in the volume of water being dumped into the Nashville Reach of the Cumberland River, the USACE

and NWS both failed to provide updates on the Cumberland River stage forecast for Nashville until 3:37 p.m.

138.    By 4:00 p.m. on Sunday, May 2, with the surge from the greatly increased volumes of water being dumped into the Nashville Reach by the USACE, the Cumberland River exceeded "major flood" stage level of 45 feet.

139.    At 4:19 p.m. on Sunday, May 2, the NWS issued an updated forecasted river crest at Nashville of 48.0 feet (approximately the 100-year flood level of 416 feet above sea level) for Monday, May 3 at 1:00 a.m.

140.    At 4:43 p.m. on Sunday, May 2, the NWS Weather Forecast Office Nashville phoned the USACE's Nashville district office to ask about updated releases. The USACE gave the NWS erroneous release data of 150,000 cfs, when the actual water release data at that time exceeded 200,000 cfs.

141.    At 7:50 p.m. on Sunday, May 2, the NWS Weather Forecast Office Nashville again phoned the USACE and the USACE again provided incorrect discharge data that was based on out-dated estimated releases, not actual releases, as of that time.

142.    The NWS Weather Forecast Office Nashville, NWS Ohio River Forecast Center, and forecasters received and used incorrect discharge data provided by the USACE until around 11:00 p.m. on Sunday, May 2.

143.    As a result of the using erroneous data, the observed rises in the Cumberland River at Nashville continued to far outpace the NWS' forecasted rises and forecasted river crest of 48.0 feet.

144.    Having failed on Saturday to create and preserve storage capacity, the USACE was forced to continually and dramatically increase those discharges until they reached a peak of 212,260 at 6:00 p.m. on Sunday evening. As a result, the Cumberland River rose above the 100-year flood plain, causing inordinate damage to property owners along the Cumberland River. After the rains subsided, the Cumberland River at Nashville crested at 51.86 feet on Monday, May 3 at approximately 6:00 p.m., inundating the lands all along the Nashville Reach of the Cumberland River.

145.    Even with a river crest of 51.86 feet (about 419.6 feet above sea level) at Nashville, the May 2010 storms did not produce flooding in excess of the "standard project flood" for the Cumberland River Basin system.

146.    The Defendant's discharge of waters through Old Hickory Dam caused the river stage of the Nashville Reach to rise well above the 100-year flood plain, causing damage to Plaintiffs' property.

### Defendant's Breaches of Duties
**Negligent Operation and Management of Old Hickory Dam**

147.    The Defendant has a duty to operate dams such that it will not create a threat of loss of life or inordinate property damage.

148.    USACE has a duty to proceed with due care in the operation and management of Old Hickory Lock and Dam.

149.    Defendant breached this duty by, among other things, failing to comply with its duty to create storage capacity in Old Hickory Reservoir in anticipation of a forecasted massive

storm event and accumulating waters behind Old Hickory's gates, leaving itself with no option on Sunday, May 2 but to suddenly discharge those waters.

150.    Defendant failed to use or misapplied scientific and engineering expertise in determining when and how to store otherwise naturally flowing waters, when and how to open the spillway gates and discharge those waters, measuring the amount of water that could be safely discharged, and assessing the hydrological risks, hydrometeorological variables, and weather-related risks presented by the May 2010 storm event.

151.    Defendant knew or should have known that if the storage capacity of Old Hickory Dam Reservoir was utilized or filled too soon, there would not be sufficient storage capacity remaining when the peak water levels were reached.

152.    Defendant knew or should have known that delayed, sudden, and excessive discharges from Old Hickory Dam would cause the Nashville Reach of the Cumberland River to rise above the 100-year flood plain, endangering lives and inundating Plaintiffs' property, buildings and structures located above the 100-year flood plain.

153.    Based upon the predicted path of the storm system leading up to the May 2010 storm event, Defendant knew or should have known that a massive amount of the rainfall from the storm system would occur in Central Basin watershed areas with unchecked tributary flow into the Cumberland River. Defendant knew that its best means to protect the people and property of Nashville was to create storage capacity at Old Hickory Reservoir.

154.    Notwithstanding the USACE's knowledge regarding the operation and management of the Old Hickory Dam Reservoir storage pool, the USACE failed to implement, miscalculated the hydrological risks, misapplied objective scientific and engineering principles,

and failed to draw down the reservoir sufficiently in advance of the peak of the predicted storm event and/or allowed that storage capacity to be used prior to the peak water level from the May 2010 storm event.

**Failure to implement or adhere to emergency procedures**

155.     Despite increasingly dire forecasts of a massive rainfall event, Defendant operated the Old Hickory Dam under "Normal Regulation" instructions and negligently failed to implement or adhere to "Flood Regulation" instructions.

156.     The USACE neglected to implement or adhere to the Emergency Action Plan for Old Hickory Dam.

157.     The USACE failed to have in place adequate emergency operating policies and procedures for dealing with the May 2010 storm event.

**Failure to implement or adhere to water control plan**

158.     USACE neglected to implement or adhere to the water control plan for the operation of Old Hickory Dam within the "standard project flood" design standards.

159.     Alternatively, USACE neglected to develop a water control plan for the operation of Old Hickory Dam within the "standard project flood" operating standards.

**Failure to Exchange Critical Data and Information**

160.     The USACE and NWS have a duty to exchange meteorological and hydrological data and information.

161.     Despite this duty, the USACE and NWS failed to have a comprehensive understanding of each other's operational procedures, forecast processes, and critical data needs during the May 2010 storm event.

162. The USACE failed to provide daily reports, information and data upon which NWS relied to prepare official forecasts during the May 2010 storm event.

163. The USACE failed to inform NWS of the huge increases in discharges through Old Hickory Dam to allow NWS to revise its forecasted river stage at Nashville and inform the public.

164. The USACE failed to provide the NWS with timely, updated discharge information as that data changed for purposes of the NWS hydraulic forecast modeling. Instead, the USACE limited its updates to the standing schedule for twice-per-day conference calls with the NWS.

165. The USACE lost network communication for many hours during an extended and critical period of time on Sunday, May 2. As a result of this communications outage, the USACE was unable to communicate in a timely and effective manner with the USACE, the NWS and others to provide needed up-to-date information and data. The USACE failed to answer phone calls from the NWS seeking updated data. Also as a result of this communications outage, USACE Water Management personnel were impaired in their ability to analyze data quickly and respond to changing conditions.

166. The USACE failed to read and respond timely to an advanced message sent via electronic mail from the USACE Ohio River Division Water Management issuing a "Flood Potential Update" regarding increases in the flood forecast, resulting in slowed internal communications within the USACE chain of command regarding the severity of the storm event.

167. The failure of the USACE to have and maintain adequate communications equipment, systems and plans, including emergency, back-up, and redundant communications,

31

seriously impacted the USACE's ability to timely and effectively communicate accurate data and information critical to the evaluation and assessment of the hydrological conditions and water management causally contributed to the breaches of their duties of care owed to Plaintiffs.

168.    The USACE provided release information and data to the NWS that was inaccurate and grossly understated the volume of the waters being discharged, knowing that the NWS would use that data and information to prepare official forecasts.

169.     The NWS did not know or understand that the USACE's daily release projections, which data the NWS uses as the major input for its forecast model simulations to generate river flow and river stage forecasts for the Cumberland River, failed to consider forecasted precipitation amounts in the projection data.

170.    When the USACE began aggressive and dramatic increases on May 2 in the waters being released at Old Hickory Dam to prevent the project from being overtopped and the locks facilities from being damaged, the USACE did not notify or update the NWS as to the increases.

171.    Despite the wide discrepancy between the river stage levels projected by the NWS using its own model regarding releases and the river stage forecast based upon discharges provided by the USACE, the NWS utilized only the USACE forecast, did not publish its own, more extreme forecast, and as a result, disseminated inaccurate river stage level forecasts to the public.

172.    During the May 2010 storm event, the USGS deployed personnel to the field to take river level measurements, high water marks, and stream flow measurements at key locations and to repair equipment. The USGS had the ability to provide real-time observations to both the

USACE and the NWS, repair damaged gages, or install temporary gages to provide critical data to the USACE and NWS.

173.    Prior to the storm event, the USACE failed to communicate critical gages and gage ratings to the USGS. As a result, the USGS did not know and could not maintain operation of critical gages and insure that critical gage readings were obtained during the May 2010 storm event.

174.    Defendant had a duty to obtain critical real-time data and information from the USGS during the May 2010 storm event and negligently failed to do so.

175.    Defendant did not attempt to contact and failed to use USGS field personnel to obtain real-time observations and data critical to the USACE and NWS in the performance of their duties during the May 2010 storm event.

**Failure to maintain facilities**

176.    USACE had a duty to exercise due care in the maintenance of Old Hickory Dam and its facilities.

177.    The USACE neglected to maintain the spillway gates at Old Hickory in good repair and operating condition. One spillway gate was out of service due to scheduled maintenance, notably during one of the rainiest months of the year, and one turbine was unavailable due to an unscheduled outage, which prevented their USACE during the May 2010 storm event.

178.    The USACE neglected to maintain critical river gages and gage ratings leading up to and during the May 2010 storm event.

**Failure to warn plaintiffs**

179.    Defendant had a duty of reasonable care to warn Plaintiffs of (1) foreseeable river-stage levels, (2) projected river-stage levels, (3) known and realized river-stage levels during the May 2010 storm event, and (4) changes in discharges from its dam projects. Defendant also had a duty to warn Plaintiffs of a known and foreseeable danger. Defendant breached each of these duties.

180.    USACE failed to inform the NWS or the Plaintiffs of its extraordinary discharges through Old Hickory Dam, despite knowing that those discharges would dramatically increase downstream river stage levels and endanger persons and property.

181.    NWS knowingly and negligently computed and released river flow and river stage projections throughout the May 2010 storm event.

182.    The NWS used inaccurate and outdated information received from the USACE in preparing its official river forecasts. As a result, the official forecasts substantially understated the expected river crest.

183.    NWS calculated and forecast a river crest forecast of 41.9 feet based on the USACE's inaccurate projections, when both the USACE and NWS knew that the NWS forecast model simulations had predicted a river crest of 54 feet.

184.    NWS failed to provide river stage forecast updates during the May 2010 storm event as required by NWS directive.

**Failure to staff/train**

185.    Because it was weekend and despite the weather forecast, the USACE failed to have adequate staff on-site to maintain adequate communications and operations. As a result, the

34

NWS was unable to contact anyone at the USACE Nashville District during the night on Saturday and early morning on Sunday to obtain updated discharge information.

186. During some of the most critical hours on Saturday and Sunday, May 1-2, the USACE neglected to have a water manager on duty to provide continuous 24-hour monitoring of the hydrological conditions and to make necessary assessments and adjustments. The USACE failed to provide updated information and data to the NWS.

187. Due to inadequate staffing, the USACE was unable to respond to the numerous telephone calls from the public requesting updated information on areas of flooding. Many calls went unanswered, including calls from the Plaintiffs.

188. The USACE failed to increase staffing levels, failed to increase frequency of communications with the NWS, and failed to contact the USGS for real-time river flow and river gage data and information during the May 2010 storm event.

189. The USACE failed to inform or train its personnel in applicable policies and procedures, and neglected to provide necessary authorizations to use the USACE computer software program for emergency operations, called "ENGLink."

## CLAIMS FOR RELIEF

### Count I -- Negligence

190. The allegations set forth hereinabove are realleged and incorporated herein by reference.

191. At all relevant times, Defendant was responsible for the implementation, execution, operation, management, maintenance, procedures, supervision, control, application of scientific and engineering principles, meteorological and hydrological analyses and assessments,

35

exchange of scientific data and river stage forecasting for the Cumberland River, and public dissemination of weather warnings and flood warnings.

192.    Defendant owed a duty to Plaintiffs, as well as all other persons and property owners located near the Cumberland River who might foreseeably be harmed, to exercise due care in the implementation, execution, operation, management, maintenance, procedures, supervision, control, application of scientific and engineering principles, meteorological and hydrological analyses and assessments, exchange of scientific data and river stage forecasting for the Cumberland River, and public dissemination of weather warnings and flood warnings with respect to the projects located on the Cumberland River and to refrain from negligent acts or omissions in carrying out those responsibilities.

193.    Defendant owed a duty to Plaintiffs, as well as all other persons and property owners located near the Cumberland River who might foreseeably be harmed, to exercise due care in the collection, exchange, use and dissemination of scientific data, information and analyses and assessments regarding meteorological and hydrological conditions, predictions and forecasting during the May 2010 storm event, and all of the duties described in this complaint and to refrain from negligent acts or omissions in carrying out those responsibilities.

194.    Defendant owed a duty to Plaintiffs to use due care in the exercise of its scientific and engineering judgment and expertise relating to the meteorological and hydrological conditions presented during the May 2010 storm event and to refrain from negligent acts or omissions in carrying out those responsibilities.

195.    At all time relevant to this litigation, Defendant knew or should have known that its failure to exercise due care in the performance of its duties and failure to warn of

life- threatening and dangerous conditions could foreseeably result in devastating harm to Plaintiffs and all other persons and property owners located near the Cumberland River.

196.    Defendant's conduct and/or failure to act fell below the standard of care owed to Plaintiffs, constituting breaches of those duties.

197.    Plaintiffs suffered catastrophic injuries and losses to their real property, personal property, and business operations as a result of Defendant's breaches of duties of care owed to Plaintiffs.

198.    The risk of harm to Plaintiffs and the ensuing harm actually suffered by Plaintiffs was reasonably foreseeable.

199.    Each Plaintiff has complied with all conditions precedent to bringing this action.

200.    Old Hickory Dam, Cheatham Dam and Cordell Hull Dam located on the Cumberland River and operated by the USACE were authorized, funded and built for power generation and navigation, and not as flood control projects.

201.    Defendant's negligent acts and omissions were such that the United States and its agencies, if private persons, would be liable to Plaintiffs in accordance with the laws of the State of Tennessee where the negligent acts and omissions occurred.

202.    The injuries and damages suffered by Plaintiffs were caused in fact by Defendant's breaches of the duties owed to Plaintiffs.

203.    The injuries and damages suffered by Plaintiffs were proximately caused by Defendant's breaches of the duties owed to Plaintiffs.

204.     As a foreseeable, direct and proximate cause of Defendant's negligence, Plaintiffs suffered significant damages, including: loss of personal property; damage to real property; diminution in value of real and personal property; costs of repair, restoration and renovation of real and personal property; loss of business income and profits; loss of business, customers and goodwill; interruption in business operations; costs of this lawsuit and attorneys fees.

### Count II – Gross Negligence

205.     The allegations set forth hereinabove are realleged and incorporated herein by reference.

206.     At all relevant times, Defendant was responsible for the implementation, execution, operation, management , maintenance, procedures, supervision, control, application of scientific and engineering principles, meteorological and hydrological analyses and assessments, exchange of scientific data and river stage forecasting for the Cumberland River, and public dissemination of weather warnings and flood warnings.

207.     Defendant owed a duty to Plaintiffs, as well as all other persons and property owners located near the Cumberland River who might foreseeably be harmed, to exercise due care in the implementation, execution, operation, management, maintenance, procedures, supervision, control, application of scientific and engineering principles, meteorological and hydrological analyses and assessments, exchange of scientific data and river stage forecasting for the Cumberland River, and public dissemination of weather warnings and flood warnings with respect to the projects located on the Cumberland River and to refrain from negligent acts or omissions in carrying out those responsibilities.

208.     Defendant owed a duty to Plaintiffs, as well as all other persons and property owners located near the Cumberland River who might foreseeably be harmed, to exercise due care in the collection, exchange, use and dissemination of scientific data, information and analyses and assessments regarding meteorological and hydrological conditions, predictions and forecasting during the May 2010 storm event, and all of the duties described in this complaint and to refrain from negligent acts or omissions in carrying out those responsibilities.

209.     Defendant owed a duty to Plaintiffs to use due care in the exercise of its scientific and engineering judgment and expertise relating to the meteorological and hydrological conditions presented during the May 2010 storm event and to refrain from negligent acts or omissions in carrying out those responsibilities.

210.     At all times relevant to this litigation, Defendant knew or should have known that its failure to exercise due care in the performance of its duties and failure to warn of life-threatening and dangerous conditions could foreseeably result in devastating harm to Plaintiffs and all other persons and property owners located near the Cumberland River.

211.     Defendant's conduct and/or failure to act fell below the duties of care owed to Plaintiffs, constituting breaches of those duties.

212.     Defendant's negligent acts or omissions were done with reckless disregard or conscious indifference for the risks of harm to the rights and property of Plaintiffs and, therefore, constitute gross negligence.

213.     Plaintiffs suffered catastrophic injuries and losses to their real property, personal property, and business operations as a result of the grossly negligent acts and omissions of Defendant.

39

214. The risk of harm to Plaintiffs and the ensuing harm actually suffered by Plaintiffs was reasonably foreseeable.

215. Each Plaintiff has complied with all conditions precedent to bringing this action.

216. Old Hickory Dam, Cheatham Dam and Cordell Hull Dam located on the Cumberland River and operated by the USACE were authorized, funded and built for power generation and navigation, and not as flood control projects.

217. Defendant's grossly negligent acts and omissions were such that the United States and its agencies, if private persons, would be liable to Plaintiffs in accordance with the laws of the State of Tennessee where the negligent acts and omissions occurred.

218. The injuries and damages suffered by Plaintiffs was caused in fact by Defendant's grossly negligent acts and omissions.

219. The injuries and damages suffered by Plaintiffs was proximately caused by Defendant's grossly negligent acts and omissions.

220. As foreseeable, direct and proximate causes of Defendant's gross negligence, Plaintiffs suffered significant damages, including: loss of personal property; damage to real property; diminution in value of real and personal property; costs of repair, restoration and renovation of real and personal property; loss of income and profits; loss of business, customers and goodwill; interruption in business operations; costs of this lawsuit and attorneys' fees.

### Count III-Trespass to Chattel

221.    The allegations set forth hereinabove are alleged and incorporated herein by reference.

222.    The excessive waters accumulated and intentionally discharged through the gates of Old Hickory Dam by the Defendant during the May 2010 storm event physically invaded Plaintiffs' property, constituting a trespass.

223.    This unauthorized intrusion was a substantial and unreasonable interference with Plaintiffs' exclusive possession of their property.

224.    Defendant's wrongful acts were such that the United States and its agencies, if private persons, would be liable to Plaintiffs in accordance with the laws of the State of Tennessee where the trespass occurred.

225.    The trespass caused significant damage, depriving Plaintiffs of the use of their property and resulting in extensive damage.

226.    As a foreseeable, direct and proximate result of this trespass, Plaintiffs suffered significant damages, including:   loss of personal property; diminution in value of personal property; cost of repair; restoration and renovation of personal property; loss of business income and profits; costs of this lawsuit; and attorney's fees.

### Count IV-Private Nuisance

227.    The allegations set forth hereinabove are alleged and incorporated herein by reference.

228.     The excessive waters accumulated and intentionally discharged through the gates of Old Hickory Dam by the Defendant during the May 2010 storm event physically invaded Plaintiffs' property, creating and constituting a private nuisance.

229.     The discharged waters resulted in a substantial and unreasonable interference with the use and enjoyment of Plaintiffs' property.  The waters inundated Plaintiff's property and caused substantial physical and economic damage.

230.     The invasion of Plaintiff's interest in the private use and enjoyment of their property was proximately caused by Defendant's storage and intentional discharge of waters through the old Hickory Dam.

231.     Defendant's wrongful acts were such that the United States and its agencies, if private persons, would be liable to Plaintiffs in accordance with the laws of the State of Tennessee where the nuisance occurred.

232.     As a foreseeable, direct and proximate result of this trespass, Plaintiffs suffered significant damages, including:   loss of personal property; diminution in value of personal property; cost of repair; restoration and renovation of personal property; loss of business income and profits; costs of this lawsuit; and attorney's fees.


RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request the entry of judgment against Defendant and that the following relief be granted:

A.      Awards of all compensatory and economic damages sustained by each Plaintiff in amounts to be determined at the trial of this cause;

B.  Awards of interest as to each Plaintiff to the extent allowed by law;

C.  Awards of attorneys' fees and costs of litigation pursuant to the FTCA and/or
Equal Access to Justice Act; and

D.  Awards of discretionary costs.

Respectfully submitted,

/s *Robert L. Echols*

Robert L. Echols, Esq. (TN# 2988)
C. David Killion, Esq. (TN# 26412)
BASS, BERRY & SIMS PLC
150 Third Avenue South, Suite 2800
Nashville, Tennessee 37201
Telephone:  615.742.7811
Facsimile:  615.742.2771
E-Mail:  rechols@bassberry.com
E-Mail:  dkillion@bassberry.com

*Local Counsel for Plaintiffs*

Keith Dalen
Lauren E. Komsa
HILL RIVKINS LLP
45 Broadway, Suite 1500
New York, New York 10006
Telephone:  212.669.0600
E-Mail:  kdalen@hillrivkins.com
E-Mail:  lkomsa@hillrivkins.com

*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing **AMENDED COMPLAINT** has been filed electronically on the 23rd day of May, 2012. Notice of this filing will be sent to the following parties by U.S. Mail, postage prepaid. Parties may access this filing through the Court's electronic filing.

U.S. Army Corps of Engineers, Nashville District
801 Broadway, Room A422B
Nashville, TN 37201

National Weather Service, NOAA
Department of Commerce
Office of Assistant General Counsel, Finance & Litigation
Washington, DC 20230

Jerry Martin
U.S. Attorney General
Middle District of Tennessee
801 Broadway, Room 800
Nashville, TN 37203

Eric Holder
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

/s *Robert L. Echols*
Robert L. Echols

10829088.1

44